May it please the Court, I am John Ridge. I represent Louis Burrell. And the record in this case, I think, is rather vast. There's like 30 reports of proceedings. I know the Court thought it had enough information to make a decision without us being here. And I indicated that I wanted to come down and address the Court, simply because I think this is one of the worst decisions I've ever seen. It has, and we'll go into detail, but basically we had a 30-year view. We enjoy the oral arguments, so please, no apologies necessary. We're glad when you feel comfortable enough to let us know you'd like to speak to us. Thank you. Basically what we have here is a 38-year marriage and a divorce that lasted four years. And why it ever went on for four years is because we had nothing but continuances, or actually motion after motion by Mrs. Burrell and her attorneys. Now prior to the marriage, my client, Mr. Burrell, owned seven rental apartments. And he gets married and shortly after the marriage he decides to construct Austin Apartments, which is a subsidized housing. And as it turns out, subsidized housing was rather lucrative, and as we went into in our filings with the Court, that was entirely awarded to Mrs. Burrell. As a matter of fact, the trial court decided that even though all of his property, the Austin Apartments and the seven units that he started the marriage with had four remaining at the time of the divorce plus Austin Apartments, the trial court decided that that was all marital property. The reason, I went through in detail, the Court is saying specifically to respond and commingle these investment properties with the rest of the investment properties. The titles were always in Mr. Burrell's name. What about the operating, checking accounts for rents and other things, utilities and different things? Absolutely, Judge, and that's what's so important here. There is not one shred of evidence in all those reports or proceedings where she is talking about any money being spent on repairs, etc. Basically, he had this rental business up and running prior to the marriage, and he continued it during the marriage. He was a high school principal in the Chicago school system, and he had this business in Kankakee, and it flourished, and he did rather well. She comes into the marriage, she had nothing, absolutely nothing, and we used some harsh words for her because there was case law that we showed the court as to why we did it. She spent the first 10 years of the marriage leaving Mr. Burrell at home and going into Chicago and partying until 2 or 3 in the morning, and if you look, we subsequently supplied the trial court with what her earnings were. Right after the marriage, she had no earnings for the next 10 years, and subsequent to that, she starts working in Austin apartments doing some of the clerical work. That's all she ever did. In fact, she ends up hiring a company to come in and do that for her because there's HUD compliance, if you would. I don't want to get too far ahead of myself. Basically, the divorce starts with an order of protection. He is removed from the marital home. Can we back up to Justice O'Brien's question, and her question I think was, was there co-mingling? The Austin apartments, were they separately run, and the accounts were separate? All of the, I think somewhere like 10 years after the marriage, all of the cash, Your Honor, went into an account that was a joint account. So for 28 years. The marriage is 38 years. After 10 years, it goes in and it's all been in the same accounts? It's all coming out of the same accounts, right. But the realization also is, his rental income, I mean, this is, for example, even Mrs. Burrell testified that there was no mortgage on Austin apartments. They never had a mortgage. It was a cash cow almost from the beginning, and we explain that in our draft of the court. But going into the detail of this now, some of the things we think the trial court did wrong. First of all, my client is charged with $256,000 of dissipation. But as I said, immediately he's out of the marital home with an order of protection. He moves into the office building, which the trial court said he could operate the business now during the dissolution process. He moves in and he's living in a rental apartment, not a rental apartment, but an apartment that they set up in that building to show prospective tenants, to show them what these accommodations would look like if they rented. Well, shortly thereafter, Mrs. Burrell comes along and removes everything from that building when my client's out of town. She took all the living accommodation and she took all the records. It's like 40 years of records were all taken, stripped to the walls. So he has to live elsewhere. He moves in and he pays rent during the four years it takes this divorce to become finalized. And the total rent he paid to a friend was $50,955 over four years as living expenses. That was for everything. If you compare that, now he had to do that because the court would never order her to put back all the furniture and the equipment and whatever you need to furnish a home. The kitchen items. She was never required to replace those or put them back. If you compare that $50,955 that the court called dissipation for his living expenses. But the court found that he made these payments, the $50,955.38, were actually mortgage payments for a female friend, not to a female friend. That's right. He paid her mortgage. That was the deal. He moved in after she emptied out the unit where he was living. He moved in with her and the deal. The purpose of this oral argument is to point out how the trial court erred, not to simply point fingers and name call here in the courtroom. Oh, no, I understand. Because that all happened in the trial court, I'm sure. Right. So your point is that trial court made a mistake by making that factual determination that the $50,000 in payments was actually for his rent? For it. And the court made a mistake by finding it was, he was making a mortgage payment for a female friend before the dissolution was finalized? Exactly. All right. That's what it was. Would you go on to make other points then with why the court's ruling was in error? Let me make the one point I'd like to make, though, before I leave that area, which I was hearing. During the four years, $310,000 are spent on her living expenses, the mortgage and all the payments to the house. And all of this is laid out. I mean, I think the court knows that there's a summary, a monthly summary, there's 46 of them in there, detailing all the expenses. That's all the rental income and all the expenses, including the expenses of paying Mrs. Burrell's maintenance, if you would. And that comes out to $310,000 compared to his $50,000. The next item is official checks. That was, that again, the court calls dissipation, $52,391. There is no detail in the record. There's nothing to support that. It's just a number that was mentioned, and the court called it dissipation. So what Mr. Burrell did is he gave the court something like $319,000, all the checks that he wrote. And there's nothing in there that's irregular or erroneous. That again was wrong. The one that they kept harping on was his gambling. That was $153,000. Now, he did do some gambling, but he also paid, if you look at this in total, for example, Mr. Burrell is accounting monthly to the court for all the income and all the expenses, all the rental income from the apartment units, including Austin apartments, and all the expenses. And it's usually breakeven or negative because he has to pay all these back real estate taxes because he's claiming she took the money. But what I'm saying is if you look at, for 46 months, the $4,500 a month he received as pension, that's $207,000. The court says $256,000 is dissipation. It has to be wrong. I mean, it just makes no sense. The money isn't there. The court never looked at any detail. So one of the biggest problems is what the court called dissipation with no detail. There's nothing in the record to support any of that. One of the complaints we have here is that the court ignored, for example, 80% of the case. Mr. Burrell put on 10 or 11 witnesses who discussed in detail, you know, they watched him build Austin apartments or contractors that he did the servicing with for all these years. They never dealt with Mrs. Burrell. He also put on witnesses who claimed there were people who wrote checks that Mrs. Burrell kept. There was also people who, witnesses who did some of the HUD work, and they testified as to how she had, out of, for example, 16 or 20 tenants in Austin apartments, she was collecting rent from like eight of them, which was not correct. It was illegal. She can't do that. She was also keeping the, they would get a subsidy to pay the utilities. She kept that. So, and further, it was mismanaged. So when Mr. Burrell took it over and Emma was no longer doing the bookkeeping, revenues increased by about $10,000 a year. Or a month, excuse me. So basically we go on and on, but the, when the court said we have the real estate, that is not commingled. That has always been separate. If there's commingling, if that can even be found, it would be yes, he had his money, the rental income, in a joint account, but that is no, that is not a reason. There's not a decision if you put money in a joint account and it comes from rental, that the property itself is commingled. There's no law to support that. But that is a law, that once you're married and you start putting things into joint accounts and you're paying bills, that the presumption is that it's marital property and it's your burden to show why it shouldn't be, what statements or what affirmative acts that he took to keep that separate. Well, he did. Well, when you're asking us to do that, you have to recall that throughout this litigation, she has taken every document he ever had in the 40 years and has kept it and the court has allowed her to do this. I mean, the court should have stepped in and demanded she return the documents. She returned nothing. The court even said, well, we'll take care of this at the end of the litigation. But as litigation went on, she kept producing these documents that were his if they proved her point. But she never, she took all the documentation. How is he to do that, Your Honor? You can't do it. He brought in witnesses to do it and the court totally ignored the witnesses. There's no doubt at all. Emma was awarded 84% of the income. That's not even an argument. That's a fact here. And she got 70% of the property. Now, this is an individual who did nothing with her life. I mean, she has no, she says she worked in Austin Apartments, but nobody recalls her. Counselor, your time is up. Thank you, Your Honor. Thank you. Mr. Hyatt. Good morning, Your Honor. Mr. Ridge. This appeal features, by Mr. Burrell, features a number of bizarre arguments. There's the argument that the Austin Apartments somehow is non-marital, despite the fact that it was constructed during the marriage. There's the allusions to the mysterious Trust 2205. There was no documentary evidence. Allusions to the fact of a prenuptial agreement between the parties. Again, no documentary evidence of that. There are accusations. There are superlatives. There's name-calling. There's factual assertions without support from the record. But there's just not a lot of legal substance. Accordingly, one of the worst decisions ever, to use Mr. Ridge's term, ought to be affirmed. I'd like to start with the allocation of the property. If you look, if you take the percentages out of context, they may, of course, seem lopsided, despite the well-settled principle that the law doesn't require an equal distribution of assets, just a just one, a fair one, an equitable one. But Judge Cramer's decision makes clear that what he did was simply, what he did was he awarded equal amounts to both parties, and then he deducted the dissipations that he charged Mr. Burrell with from his share. That's the context. There's no mention of that, of course, by Mr. Burrell. But the end result was after Mr. Burrell had been charged with the dissipations, which we proved at trial. Mr. Burrell was awarded income-producing assets. He was awarded one-half of his pension. And it's clear that there was no way to award the Austin apartments to both parties. They had to go to one or the other, as I pointed out in the Thomas case, which noted a similar factual situation. But the evidence showed, and this, again, without regard to the unsupported allegations of Ms. Burrell partying with her friends, driving up to Chicago every night, that sort of thing. The evidence actually showed that from the construction of the Austin apartments on, that was Ms. Burrell's occupation. Indeed, it was her livelihood. That is what she did during the marriage. Mr. Burrell was employed as a high school principal until, I believe, 2000. He was employed within the Chicago Public Schools District until, I believe, 2002. So while Mr. Burrell is working as a principal and then as a school administrator, Ms. Burrell was the one who ran these properties. She collected the rents. She called for the repairs to be made when they needed to be made. That was what she did throughout the marriage. Did I read where they had two children during the course of the marriage? They did. Both emancipated as of then. And that, despite what was alleged in the brief, that was judicially admitted  But I'm guessing having two pregnancies kept her busy at least for nine months. I'm sure it did, Your Honor. And then raising children, it looks like perhaps the Austin apartments were constructed after the kids reached perhaps school age. Yes, they would have been young, but I believe that's correct.  And it simply can't be said that what Judge Kramer did was unreasonable or arbitrary or concocted out of fancy. He separated the properties into roughly two piles, and then he subtracted what Mr. Burrell had dissipated from the estate. That resulted in the unequal percentages. Did your client request maintenance? She did not request maintenance following the trial. She requested the Austin apartments. Well, actually, I think she alternatively argued, I think we alternatively argued, that she should be awarded maintenance in an amount deemed just by the court. And did the court allow that request? No, the court expressly denied it. With regard to the issues of dissipation and transmutation, these issues were made clear from the outset. Those issues were on the table from the outset, or at least dissipation was. But in response to our allegations both as to dissipation and as to transmutation of those four properties acquired prior to the marriage, there was virtually nothing presented by Mr. Burrell. On the issue of transmutation, it's almost as though Mr. Burrell believed that all he had to show was that the properties were acquired before the marriage, and that was it. There was nothing offered in response to our evidence. What about the North Indiana property? You didn't really speak to that in your brief. Well, my point in the brief... You mentioned several transmutation factors. In that one, you just made a reference to it. Coincidentally, that's the one that we were awarded. The point I made in the brief is that basically I don't know why we were spending as much time on the issue of transmutation. All we got was one property of the four. But I think our evidence of trial was that North Indiana was commingled with the other properties. It was rented. It was used along with the other properties. It was not treated differently from the marital assets, and that was the thrust of our argument in Judge Cramer's decision, that these properties were not... There have to be some specific acts of transmutation. Can you simply say, well, they all collected the rent or something? I mean, they all were treated the same. I mean, you have to have some act of transmutation of the property. Yes, and the burden is high. It's clear and convincing evidence. But I believe what the evidence showed, not just as to Indiana, but as to all four of the properties, was that they weren't... Some of the properties were used as collateral to secure joint applications. Other properties were rented. And when tenants had to be evicted, the five-day notices of the forcible complaints were in the names of both Mr. and Mrs. Burrell. I don't recall any specific evidence as to Indiana, but I believe all the evidence in the case as to these four properties was that they were not treated differently from the marital assets. So I believe the judge's ruling in that regard should stand. With regard to the dissipation issues, first there's the payments of Mr. Burrell's mortgage, Miss Ford, about $50,000 in mortgage payments. Not only was there really no evidence that contradicts that, but he freely admitted paying her mortgage. The official checks, again, and these totaled about $50,000. There was absolutely no evidence presented by Mr. Burrell with regard to what these checks were for. I believe the record reflects that at trial he was asked for an explanation as to what these checks were for, and he didn't offer any. It was only after the judgment ruled, and after the judgment for dissolution was entered, that he obtained copies of the canceled checks, and of course at that point he couldn't satisfy the standard for reopening the proofs. He didn't offer any explanation for these checks. What about Mr. Ridge's argument that they had made repeated requests to have documents turned back over that were in your client's possession? There was a ruling early in the case. It was before I entered my appearance for Mr. Burrell. That issue did come up during the trial, whether she had fully turned over all business-related documents. We recessed the trial. She turned over the remaining documents that she had, aside from making a statement before the trial court, and then before this court that what she turned over was essentially garbage. There was nothing more. There was never any follow-up by Mr. Burrell complaining that we were withholding evidence. We turned over all the remaining business documents that we had, and that was the last that we heard of it when we proceeded with the trial. The ATM transactions at Harris-Joliet, that's the one issue of dissipation that Mr. Burrell bothered to contest, and that's where he said, yes, I gambled. I gambled quite a bit. In fact, I'm going to gamble when we're done with the hearing for this afternoon. But these transactions, I was pulling out cash, and I was using that to pay my employees. It's no wonder the trial court found his testimony to be so incredible. What Mr. Burrell didn't seem to understand is that when we put these allegations of dissipation before him, the burden shifts to him, that he's the one who's expected to rebut the allegations of dissipation with evidence, and he never did that. So the findings of dissipation, they were thoroughly considered by the trial court, and they should stand. The notice argument, that's laughable. We've been making an issue about gambling pretty much from the day the petition for dissolution was filed. How can Mr. Burrell not know that we were alleging that he was wasting marital assets? Likewise, the allegations regarding his spending of money, business money that should have been going into the rental business  Those allegations were before Mr. Burrell early in the case, and it's disingenuous to claim a lack of notice. I don't recall the date, Your Honor. It was sometime, I believe Ms. Burrell was awarded exclusive possession of the marital residence at 2330 Grace early in the case, and I believe that he moved in with her shortly after that. So I don't know. And was he paying the mortgage payments prior to that, or just after he moved in? I don't recall, Your Honor. I'm sorry. An issue that Mr. Rich didn't get to, but that a lot of noise was made about at trial, was the request to admit. The arguments, or the recitation of the rule, Bright v. Dickey is well taken, that it's not good cause simply to say, well, you're not prejudiced by our late response to your request to admit, so we ought to be able... Absence of prejudice alone doesn't constitute good cause. Judge Kramer distinguished this case by, and I believe this, I don't think it's clear, but I believe it's evident that the decision was, it was evident that we were attempting compliance with the rule. We filed our response with the court on the 25th day of filing the request. Counsel, you have two minutes. Thank you. Inadvertence resulted in the response being submitted late. Judge Kramer ruled that under the circumstances that he would find good cause and allow the late filing. That's subject to an abuse of discretion standard. There's nothing. That decision is fair. It's reasonable. There's nothing arbitrary about it. It shouldn't be set aside, but it doesn't matter. If you read the requests submitted by Mr. Ridge, by Mr. Burrell, they asked for us to admit legal conclusions. There's nothing factual in these requests with regards to the four insurance checks that could be properly admitted. So even if there were a basis to find that Judge Kramer's allowance of the late response should be reversed, there's no way to find that these requests should be deemed judicially admitted. Help me understand this issue. The response was filed with the court, but through inadvertence it was not served or mailed to counsel. Is that what happened? Correct. And do you agree that it was not mailed, or is it a situation where he just didn't receive it? No, I disclosed to the court that it had not been mailed for over ten days after it was filed. I don't think we got into the reasons why. That helps me. Thank you. Counselor, your time is up. Thank you. Mr. Ridge. Thank you, Your Honors. On that last issue, it was simply never served on us. Filing with the court means nothing. They don't have to file anything. They have to serve it to us. They didn't bother doing it. And never, never once in any argument in front of the trial court did they even attempt to show good cause. When I brought it back out on a motion to reconsider, the court somehow did it for them. But it can't be done that way. The court can't even get into the area unless they show good cause. They showed nothing. Their good cause is their inadvertence, they're saying. This case is 100% transmutation without any reimbursement. How do you do that? That's new law. That is absolutely against the statutes. It's against everything. That's exactly what Judge Cramer did. And when he actually said evidence, they presented no evidence. They took all my client's evidence, and they presented nothing. My client went out and got to court new evidence that, for example, Austin Apartments was always in his name. These other seven apartments or units that he owned prior to the marriage, four of them he still owned, and they were all in his name. We need some substance, Your Honor, that she did something. All that lady did was steal. And it's well documented. If you go back and read the witnesses that we brought in, the rental income increased $10,000 a month when she was taken out of control. So to say that she contributed something or anything of substance, she did nothing. In the entire marriage, if you average her earnings over 38 years, it comes to $425 a year. And that's what she declared, but we're saying she took. And that's, for example, $175,000 that she cleaned out of the accounts before she filed divorce. That's what these requests to admit were about. He talks about this Thomas decision, and I tried to lay that out for the court. In Thomas, it was a service business. It wasn't an ownership of real estate or anything prior to the marriage. They started this cleaning company during the marriage. The court found that the husband dissipated at least 50% of that business when the divorce was going on. He gave the other 50% to the wife. That's Thomas. It's not even comparable to the facts in this case. As I say, there's not one witness that testified that Emma was involved in this. There's not one. She didn't bring in... They're talking about evidence? Where's the evidence? We brought in 10 people. But is that required? I mean, there are many, many, many circumstances where one spouse doesn't work outside collecting an income throughout an entire course of a marriage, but that doesn't prohibit them from being awarded marital assets. Oh, no. I'm talking about the business. She didn't work in the business. She didn't do what she's telling this court she did. We brought in people who were electricians, people who rented implements to the company, people Mr. Burrell has dealt with all his life in this business, the accountant, for example. All of them say it's Mr. Burrell, Mrs. Burrell, had nothing to do with operating this business. So, I mean, I don't know. There's no support at all from Mrs. Burrell other than her getting up there. She's saying, gee, I finished high school, and my last job was a bursting clerk for Ryerson Steel in Chicago, bursting checks, if you would. And from that, I engineered, I constructed, I was involved in building these four units. Well, excuse me, there's three apartment units. She claims she was the architect, the driving force. She wasn't even there. There's people who came in as witnesses, and it's unrefuted. She wasn't even there. She wasn't even at her house. Justice O'Brien's point is maybe that's relevant with regard to a business relationship, but this is a marital relationship, and when it ends, the trial judge has an obligation to split the marriage assets in half. Judge, and I'm not arguing that. All I am saying is when you talk about dissipation, she dissipated. I mean, when you say the rental income increased $10,000 a month after the books were taken away from her, I think that's rather significant. Counsel, your time is up. Thank you, judges. We will be taking the matter under advisement and rendering the decision without undue delay. All right. For now, there will be a brief recess for the panel.